**UNITED STATES of America, Plaintiff–Appellee, Cross–Appellant,**

v.

**Grahame P. SANDERS, Defendant–Appellant, Cross–Appellee.**

Nos. 95–5744, 95–5819.

United States Court of Appeals, Sixth Circuit.

Argued May 17, 1996.

Decided Sept. 12, 1996.

---

James Zerhusen, Frances E. Catron (argued and briefed), Asst. U.S. Attorneys, Lexington, KY, for Plaintiff–Appellee, Cross–Appellant.

James A. Shuffett, Lexington, KY (argued and briefed), for Defendant–Appellant, Cross–Appellee.

Before: BOGGS and MOORE, Circuit Judges; HILLMAN, District Judge.*

MOORE, Circuit Judge.

Defendant-Appellant Grahame P. Sanders appeals his convictions and sentence for conspiring to commit wire fraud in violation of 18 U.S.C. § 371 and committing wire fraud in violation of 18 U.S.C. § 1343. Sanders asserts that the district court erred when it admitted allegedly prejudicial evidence, denied his motion to introduce a co-conspirator's acquittal, entered a restitution order, and valued the loss for sentencing purposes. The government cross-appeals, claiming that the district court failed to enhance Sanders's sentence in accordance with the Sentencing Guidelines. For the reasons stated below, we affirm the district court's judgment of conviction, but we vacate Sanders's sentence and remand the case for resentencing.

## I. BACKGROUND

In 1991, Gary White and Sanders started an insurance company called Griffin Insurance and Reinsurance Co., Ltd. ("Griffin"). Sanders apparently advised White about setting up the company and asked another person to register Griffin as an offshore company in the British West Indies. The Griffin financial statement falsely listed some personal assets and other non-existent assets as corporate assets. White operated Griffin, while Sanders referred potential clients to the company. Both White and Sanders provided potential customers with the false financial statements. Griffin purportedly provided both insurance and performance bonds but never paid any claims made against it. Indeed, Sanders instructed White on how to process claims but avoid paying them. The premiums collected apparently were distributed among Sanders, White, Thomas Reid Methvin, and Gene J. Lambert.

In 1994, Sanders, White, Methvin, and Lambert were indicted on sixty-nine counts of conspiracy and wire fraud. Methvin and White pleaded guilty, and Lambert was acquitted after a jury trial. Sanders was convicted after a jury trial and sentenced to thirty-three months of imprisonment. Sanders timely filed a notice of appeal to this court, and the government cross-appealed.

## II. ANALYSIS

Sanders appeals both his conviction and sentence, raising six issues. We discuss each issue in turn.

### A. Admission of the Methvin Letter

█ Sanders argues that the district court erred by admitting a letter from co-conspirator Methvin to co-conspirator White. The letter referred to a pending investigation by the State of Florida into Sanders's activities

---

* The Honorable Douglas W. Hillman, United States District Judge for the Western District of Michigan, sitting by designation.

and portrayed Sanders as trying to "screw" his partners. The letter stated:

> A few weeks ago, an investigator from the Insurance Department of the State of Florida, called and ask [sic] questions about your friend Grahame Sanders. They are building a case against him about some of his past activities. I tell you this because, unless I receive the refund of the $600.00 for the Travel Agents Bond and the $375.00 for Systems Forming $11,500 Bond and some "help" in getting some of the $5,000.00 on the Puckett Bond, I intend to cooperate fully with the investigator. Grahame has until noon Friday, 10/4/91.
>
> Gary, as you know I don't believe in screwing your friends/partners. That is just what he is trying to do to me. If he'll do it to me, he'll do it to you to [sic]. Also, he has made us look like crooks and fools to our big client, Systems Forming Co.
>
> Anything you can do in this regard, will be appreciated.

Letter from T. Reid Methvin to Gary White, Appellant's Br. at 5; Government's Br. at 20.

■ Sanders challenges the admission of this letter pursuant to Rule 403 of the Federal Rules of Evidence. This court reviews Rule 403 challenges to a district court's decision to admit evidence or testimony for abuse of discretion. *United States v. Bonds*, 12 F.3d 540, 567 (6th Cir.1993). We must view the evidence in the light most favorable to the government by maximizing the probative value of the evidence and minimizing its potential prejudice. *United States v. Moore*, 917 F.2d 215, 233 (6th Cir.1990), *cert. denied*, 499 U.S. 963, 111 S.Ct. 1590, 113 L.Ed.2d 654 (1991). Moreover, the prejudice to be weighed is the *unfair* prejudice caused by admission of the evidence. Evidence that is prejudicial only in the sense that it paints the defendant in a bad light is not unfairly prejudicial pursuant to Rule 403. *United States v. Mullins*, 22 F.3d 1365, 1373 (6th Cir.1994).

The district court did not abuse its discretion when it admitted the Methvin letter. The Systems Forming bond referred to in the letter apparently formed the basis of some of the charges in the indictment. Indictment, Counts 63–69, J.A. at 83–84 (refer-

ring to Systems Forming bond). The letter also is probative in that it ties Sanders to the activities of the conspiracy—the letter was written during the course of the conspiracy and refers to acts of the conspiracy. Thus, the letter has some significant probative value. Its prejudicial effect mainly is its portrayal of Sanders as a crook and as someone trying to sell out his co-conspirators. Thus, the letter prejudices Sanders by making him look bad but does not unfairly prejudice him by confusing or misleading the jury. At most, any unfair prejudice is minimal and is outweighed significantly by the probative value. Thus, the district court did not abuse its discretion by admitting the letter into evidence.

### B. Admission of Testimony of Insurance Regulators

■ Sanders also argues that the district court abused its discretion by admitting the testimony of insurance regulators Connell, Johnson, and Cordial regarding licensing requirements for domestic and offshore insurance companies. Sanders argues that the evidence was confusing to the jury and thus unfairly prejudicial pursuant to Fed.R.Evid. 403. This court reviews the district court's decision to admit this testimony pursuant to the abuse of discretion standard of review discussed in Section IIA above.

The government argues that the evidence was relevant to show Sanders's knowledge that Griffin was a sham company that was operating illegally. The government's theory apparently was that Sanders, who had extensive experience in the insurance industry, knew of the regulatory requirements and knew that Griffin was operating in violation of those requirements. The evidence presented is somewhat probative for this purpose, although it may have been somewhat confusing to the jury. Any confusion, however, was mitigated by the district court's limiting instruction. This instruction cautioned the jury that Sanders was not being tried for violating licensing laws, and that the licensing information could be used only for determining Sanders's state of mind, i.e., whether he knowingly defrauded his customers. Jury Instructions, J.A. at 449–50. When we view

the testimony in the light most favorable to the government by maximizing its probative value and minimizing its prejudicial effect, as we must, we cannot find that the district court abused its discretion by admitting the insurance regulators' testimony.

## C. Failure to Admit Co–Conspirator's Acquittal

Sanders argues that the district court erred by refusing to admit testimony that co-conspirator Lambert had been acquitted, when the government was permitted to elicit from co-conspirators Methvin and White that they had pleaded guilty to some of the charges in the indictment. Although Sanders's argument has surface appeal, it does not withstand close scrutiny.

Generally, the guilty plea or conviction of a co-defendant or co-conspirator is not admissible at trial, and such guilty pleas and convictions are never admissible as substantive evidence of the defendant's guilt. *United States v. Blandford*, 33 F.3d 685, 709 (6th Cir.1994), *cert. denied*, — U.S. —, 115 S.Ct. 1821, 131 L.Ed.2d 743 (1995). However, guilty pleas and convictions may be introduced into evidence if the co-conspirator or co-defendant testifies at trial, so that the factfinder will have appropriate facts on hand to assess the witness's credibility. *Id.* When a guilty plea or conviction is introduced into evidence, the district court is required to give a cautionary instruction to the effect that the jury may use the conviction or guilty plea only to determine the testifying witness's credibility. *Id.* Convictions and guilty pleas generally are not admissible for credibility purposes if the co-conspirator or co-defendant does not testify, and convictions and guilty pleas of co-conspirators or co-defendants other than the witness are not admissible to attack or bolster the witness's credibility. *See United States v. Austin*, 786 F.2d 986, 992 (10th Cir.1986) ("We have found no case, and the Government has not cited one, in which a conviction other than that of the witness himself was properly admitted on the issue of his credibility.").

Methvin and White, whose guilty pleas were admitted, both testified for the government at Sanders's trial. Their guilty pleas properly were admitted for credibility purposes, and the district court gave an adequate limiting instruction. Lambert did not testify at Sanders's trial, so if he had pleaded guilty, his plea would not have been admissible. Thus, under a parallel treatment for guilty pleas and acquittals, his acquittal may not be admitted either. *See United States v. Fernandez–Roque*, 703 F.2d 808, 813 (5th Cir.1983) (district court did not abuse its discretion by refusing to admit the acquittal of a non-testifying co-conspirator to impeach a co-conspirator witness's testimony).

Sanders has not presented any theory for admission of Lambert's acquittal other than to influence perceptions of credibility, although it appears that Sanders would like to use the co-conspirator's acquittal as substantive evidence of his own innocence. Because the government could not make such substantive use of the guilty pleas of Methvin and White, the government cannot have "opened the door" to Sanders's use of Lambert's acquittal as substantive evidence. Thus, the district court did not abuse its discretion in refusing to admit testimony about Lambert's acquittal.

## D. Calculation of the Amount of Loss

Sanders asserts that the district court erred by calculating the amount of loss for sentencing purposes as the amount of premiums collected by the entire conspiracy, which totaled $729,139, instead of the amount he was ordered to pay in restitution to the victims, which totaled $97,835.60. We review the district court's factual determinations at sentencing for clear error, but we review the district court's interpretation of the Sentencing Guidelines de novo. *United States v. Flowers*, 55 F.3d 218, 220 (6th Cir.), *cert. denied*, — U.S. —, 116 S.Ct. 261, 133 L.Ed.2d 185 (1995).

U.S.S.G. § 2F1.1(b), which applies to fraud offenses, requires the district court to increase the defendant's base offense level depending on the amount of loss caused by the fraud at issue. Application Note 7 to § 2F1.1 states that:

> ... loss is the value of the money, property, or services unlawfully taken.... [I]f

an intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss. Frequently, loss in a fraud case will be the same as in a theft case. For example, if the fraud consisted of selling or attempting to sell $40,000 in worthless securities, or representing that a forged check for $40,000 was genuine, the loss would be $40,000.

This Application Note clearly shows that the amount of loss should be the amount of premiums collected. Sanders and his co-conspirators sold worthless insurance policies for $729,139—the total amount of premiums collected. The worthless insurance polices are akin to the worthless securities described in the Application Note, and the amount of premiums is the value of the money unlawfully taken. Moreover, the amount collected by the entire conspiracy may be attributed to Sanders because the district court found that all of the conspirators' activities were reasonably foreseeable to Sanders. *United States v. Brown,* 66 F.3d 124, 128–29 (6th Cir.1995) (stating that the entire amount of the loss may be attributable to a conspirator when other activities are reasonably foreseeable to that conspirator), *cert. denied,* —— U.S. ——, 116 S.Ct. 954, 133 L.Ed.2d 877 (1996). The district court's finding on this point is not clearly erroneous, given Sanders's central involvement in initial planning, client recruitment, and non-payment of filed claims.

 Sanders relies on fraudulent loan application cases to argue that only the amount of the victim's actual loss should be considered for sentencing. However, in fraudulent loan application cases, the victim may recoup some of the losses by selling collateral that the defendant used to secure the loan. In a fraudulent insurance scheme such as Sanders's, the victims are not left with any collateral to sell. *See Flowers,* 55 F.3d at 221 (discussing difference between secured loan fraud cases and other types of fraud cases). The Sentencing Commission also makes clear this distinction between secured loan fraud cases and other fraud cases in U.S.S.G. § 2F1.1, App. Note 7(b). Application Note 7(b) applies only to fraudulent loan application and contract procurement claims and states that the loss in those types of cases should be valued at the amount owed on the loan reduced by the amount recovered by the victim through the sale of assets used to secure the loan. Thus, the district court did not err by distinguishing this fraudulent insurance scheme from secured loan fraud cases or in calculating the loss at $729,139, which equals the total amount of premiums collected by the conspiracy.

### E. Restitution Order

 Sanders argues that the district court erred by imposing restitution when the court had found that Sanders could not pay a fine, and by stating that it was "required" to impose restitution. In ordering restitution, the district court stated:

> The Court finds that Mr. Sanders does not have the financial ability to pay a fine. The Court is required to order a special assessment in the amount of $50 on each count of conviction. So the special assessment will be $3200. The Court *is required* to order that restitution be made to SGB, Inc. in the amount of $19,322.13; Kocher Lumber Company, Inc., $13,939.07; W.T. Mayfield Sons Trucking, $4,908.80; John and Laura Proctor, $14,025; Choctaw, Inc., $19,917.02; Florida Steel Corporation, $19,414.27; Enco Materials, Inc., $6,309.31; and this obligation will not be affected by any restitution payments made by the other defendants.

Sentencing Hearing Transcript ("Sent. Hrg.Tr."), J.A. at 164 (emphasis added). Upon evaluation of the relevant statutes and the Sentencing Guidelines we conclude that the district court was not required to order restitution in this case.[1]

---

1. The Antiterrorism and Effective Death Penalty Act of 1996, 110 Stat. 1214, Public Law 104–132 (April 24, 1996), amends the Victim and Witness Protection Act, 18 U.S.C. § 3663 et seq., and requires restitution to be imposed in certain cases including fraud cases. § 204, 110 Stat. at 1227–1229, enacting new 18 U.S.C. § 3663A. However, the new law will not affect this case upon resentencing because the new law applies only if the conviction occurred on or after April 24, 1996, the date the antiterrorism law was enacted. § 211, 110 Stat. at 1241.

The district court imposed restitution pursuant to the Victim and Witness Protection Act ("VWPA"), 18 U.S.C. § 3663 et seq. The language of § 3663 is itself permissive, and clearly grants the district court discretion to order restitution by stating that the court "*may* order ... that the defendant make restitution to any victim of such offense." 18 U.S.C. § 3663(a)(1) (emphasis added). Pursuant to 18 U.S.C. § 3664(a), the district court is required to consider several factors in determining whether to order restitution and the amount of any restitution ordered. Section 3664(a) states that:

> The court, in determining whether to order restitution under section 3663 of this title and the amount of such restitution, shall consider the amount of the loss sustained by any victim as a result of the offense, the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents, and such other factors as the court deems appropriate.

Thus, § 3664(a) mandates that a district court consider certain factors in determining whether or not to exercise its discretion to order restitution pursuant to § 3663(a)(1).

It is true that § 5E1.1(a)(1) of the Sentencing Guidelines states that "[t]he court shall enter a restitution order if such order is authorized under 18 U.S.C. §§ 3663–3664...." Although § 5E1.1 contains mandatory language, upon a careful reading it is readily apparent that this guideline section requires the court to order restitution only when the court has made the discretionary determination that restitution should be ordered after consideration of the factors set forth in the VWPA. *See United States v. Owens,* 901 F.2d 1457, 1459 (8th Cir.1990) ("[w]e read the mandatory language in Guideline § [5E1.1 [2]] to require only that

restitution orders be imposed in accordance with the VWPA and not that restitution shall be ordered in every case."). Thus, we hold that, under the plain language of both the statute and the guideline, the district court was not required to order restitution in this case.[3]

The district court's order, however, states that the court was "required" to order restitution, and does not contain any on-the-record consideration of the statutory factors. Although they are required by § 3664(a) to consider the listed factors in determining whether to order restitution, district courts are not required to make explicit findings about the statutory factors. *United States v. Blanchard,* 9 F.3d 22, 25 (6th Cir.1993) (district courts not required to make factual findings on the record regarding defendants' ability to pay restitution). Such findings would, however, be helpful on review. *Id.* The lack of such findings here indicates that the district court may not have considered all of those factors because it believed it was required in any event to impose restitution. Thus, we vacate the district court's restitution order, and remand the case for resentencing, so that the district court may determine whether to order restitution in light of its consideration of all the factors listed in § 3664(a).

We note that although the district court found that Sanders could not pay a fine, it would not necessarily be an abuse of discretion for the district court to order Sanders to pay restitution upon an evaluation of the § 3664(a) factors. A district court may order restitution even if it finds that the defendant cannot pay a fine, if the court finds that the defendant has a substantial probability of earning future income. *United States v. Bondurant,* 39 F.3d 665, 668 (6th Cir.

---

2. U.S.S.G. § 5E1.1(a)(1) has replaced § 5E4.1(a)(1), the provision of the Guidelines actually cited in *Owens.* Section 5E4.1(a)(1) stated that "[r]estitution shall be ordered for convictions under Title 18 of the United States Code ... in accordance with 18 U.S.C. § 3663(d)...." *Owens,* 901 F.2d at 1459 (noting replacement).

3. Our view is supported by Congress's recent action described in note 1, *supra,* making restitu-

tion mandatory in certain cases including fraud, where conviction occurs after April 24, 1996. The new statutory provision would have been unnecessary if restitution in such situations already were mandatory, and Congress is presumed to know "about existing law pertinent to the legislation it enacts." *Goodyear Atomic Corp. v. Miller,* 486 U.S. 174, 185, 108 S.Ct. 1704, 1712, 100 L.Ed.2d 158 (1988).

1994). In *Bondurant,* the court found that restitution could be ordered because of the defendant's intelligence, education, and employment record. *Id.* Likewise, the district court could have found in this case that Sanders had significant earning potential because he was highly educated and had extensive experience in the insurance business.

### F. Leadership Enhancement

■ The government cross-appealed the district court's failure to impose the four-level enhancement for a leader or organizer required by U.S.S.G. § 3B1.1(a). The district court did, however, enhance Sanders's sentence by two levels pursuant to U.S.S.G. § 3B1.1(c). The government argues that the district court erred by imposing only a two-level enhancement when the district court made the findings required to impose a four-level enhancement.

The district court did find that Sanders was an organizer or leader of the conspiracy at issue. Sent. Hrg. Tr., J.A. at 151–52. To enhance the sentence pursuant to subsection (a), the district court also would have been required to find that Sanders's activity "involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). Although the district judge stated that he had "difficulty" in finding five participants in the conspiracy, the district judge did find expressly that the conspiracy was "otherwise extensive" because activities in furtherance of the conspiracy took place in several states. Sent. Hrg. Tr., J.A. at 150. Upon the district court's explicit findings that Sanders was an organizer or leader and that the criminal activity was "otherwise extensive," a four-level enhancement is mandated by U.S.S.G. § 3B1.1(a).

■ When a district court has made "a factual finding as to the applicability of a particular adjustment provision, the court has no discretion, but must increase the offense level by the amount called for in the applicable provision." *United States v. Feinman,* 930 F.2d 495, 500 (6th Cir.1991). In this case, the district court made factual findings that would require a four-level enhancement, but imposed only a two-level enhancement. In most cases like this one, we would

remand for imposition of a four-level enhancement. However, other portions of the sentencing hearing transcript indicate that the district court may have been giving only its preliminary thoughts in this case when it made those findings, or that the district court may have changed its mind about those findings during the sentencing hearing, since the district court clearly expressed its conclusion that only a two-level enhancement was warranted based upon its view of the evidence. Because we are unsure which findings the district court actually intended to make, we will vacate Sanders's sentence and remand the case to the district court so that it can clarify its findings on the organizer/leader and five participants/otherwise extensive issues. If the district court does find on remand that Sanders was an organizer or leader and that his scheme had five or more participants or was otherwise extensive, it must impose a four-level enhancement pursuant to U.S.S.G. § 3B1.1.

### III. CONCLUSION

For the reasons stated above, we **AFFIRM** Sanders's convictions, but **VACATE** his sentence and **REMAND** for resentencing in accordance with this opinion.